IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **7-ELEVEN, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **VIPUL PATEL**, <br><br> Defendant. | Civil Action No._____ |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff 7-Eleven, Inc. ("7-Eleven"), by and through its attorneys, for its Complaint For Injunctive And Other Relief ("Complaint") against Defendant Vipul Patel ("Patel") alleges as follows:

### Introduction

1. This action arises out of Patel's fraudulent scheme to steal money from 7-Eleven, 7-Eleven's termination of the parties' written franchise agreements, and Patel's subsequent refusal to comply with the post-termination obligations under those franchise agreements. 7-Eleven seeks, among other things, possession of the premises of Patel's former franchised 7-Eleven stores. 7-Eleven also seeks a preliminary and permanent injunction enjoining Patel's wrongful and unlawful use of 7-Eleven's federally registered trademarks, damages for Patel's infringing and other wrongful conduct, and the attorneys' fees and costs it has incurred and will incur in prosecuting this action.

1

## Jurisdiction, Venue and Parties

2. This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338 and 1367, in that this is a civil action involving claims arising under the laws of the United States, including an Act of Congress relating to trademarks, and wherein all other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.

3. This Court also has original subject matter jurisdiction over this action under 28 U.S.C. § 1332, in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

4. Plaintiff 7-Eleven is a citizen of the State of Texas, being a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Irving, Texas.

5. Defendant Patel is an individual residing in and is a citizen of the Commonwealth of Massachusetts.

6. Venue is proper in this judicial district because Patel resides in this judicial district, and a substantial part of the events out of which 7-Eleven's claims arise occurred in this judicial district.

## 7-Eleven's Registered Trademarks, Service Marks and Franchise System

7. 7-Eleven is an operator and franchisor of convenience store retailing businesses. There are more than 10,000 7-Eleven stores in North America and more than 60,000 worldwide. The 7-Eleven brand is widely known and recognized as the premiere brand in the convenience store industry.

8. Based upon years of experience, 7-Eleven has developed, and is the sole and exclusive owner of, unique and uniform systems relating to the establishment and operation of 7-Eleven high-end convenience food stores (the "7-Eleven System").

9. The 7-Eleven System is a comprehensive business format for the establishment, operation, and development of high-standard convenience food store businesses with distinctive features in products, services, distribution, accounting, training, and management assistance. The 7-Eleven System is designed to ensure that 7-Eleven convenience stores and the services and products offered therein meet uniform, high quality standards. The 7-Eleven System is also designed to protect 7-Eleven's name and reputation. As such, all 7-Eleven franchise agreements require franchisees to comply with the 7-Eleven System in the operation of their 7-Eleven convenience stores.

10. The 7-Eleven System is widely known and favorably recognized by consumers. Consumers choose 7-Eleven because of 7-Eleven's high reputation for, *inter alia*, quality and service. The 7-Eleven System is founded upon adherence to 7-Eleven's standards and specifications.

11. To identify the source, origin and sponsorship of 7-Eleven convenience stores and the services they offer, and to distinguish those 7-Eleven convenience stores and the products and services provided therein from those established, made, offered and sold by others, 7-Eleven has extensively used certain trademarks, service marks, trade names, logos, emblems and indicia of origin, including, but not limited to the following names and marks (the "7-Eleven Marks"):

| Mark | Registration Number | Effective Date |
| --- | --- | --- |
| 7-ELEVEN | 718,016 | 7/4/1961 |

| Mark | Registration Number | Effective Date |
|---|---|---|
| 7-ELEVEN | 920,897 | 9/21/1971 |
| OH THANK HEAVEN FOR 7-ELEVEN | 1,008,307 | 1/17/1978 |
| SLURPEE | 829,177 | 7/8/1967 |
| BIG GULP | 1,110,172 | 12/26/1978 |
| 7-ELEVEN LOGO AND DESIGN | 896,654 | 8/11/1970 |

12. The 7-Eleven Marks are registered on the Principal Register of the United States Patent and Trademark Office. These registrations continue in full force and effect and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

13. 7-Eleven has given notice to the public of the registration of the 7-Eleven Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that 7-Eleven and its authorized licensees remain the exclusive users of the 7-Eleven Marks.

14. 7-Eleven has continuously used the 7-Eleven Marks in interstate commerce in connection with the promotion and licensing of 7-Eleven convenience stores and the services they offer throughout the United States, including the State of Massachusetts, since the date of their registration.

15. 7-Eleven and its authorized franchisees use the 7-Eleven Marks as the marks and trade identity by which the products and services offered by 7-Eleven and its franchisees are distinguished from other convenience store businesses and the products and services offered by them.

16. 7-Eleven and its authorized franchisees have extensively advertised and promoted 7-Eleven convenience stores and the services they offer under the 7-Eleven Marks throughout

the United States and through various media. As a result of such efforts and the considerable money spent in connection therewith, the services offered by 7-Eleven and its licensees under the 7-Eleven Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including the State of Massachusetts.

17. By written franchise agreements, 7-Eleven licenses the use of the 7-Eleven Marks and the 7-Eleven System to others, requiring them to operate in accordance with 7-Eleven's specifications in order to protect 7-Eleven's image and brand. In addition, a 7-Eleven franchisee must to pay to 7-Eleven a defined percentage of its gross income, called the "7-Eleven Charge."

18. Other salient features of the 7-Eleven System include:

>A. **The Open Account**: 7-Eleven extends financing to its franchisees for use in the operation of franchised stores. The amount financed by 7-Eleven and the balance due from its franchisee is maintained in an account defined in the franchise agreement as the "Open Account." Essentially, the Open Account is a running working capital account that carries the outstanding balance that 7-Eleven has loaned to the franchisee.
>
>B. **Retail Information Systems**: 7-Eleven franchisees must use a proprietary Retail Information System computer system and software having various point of sale, inventory management, and back-office functions. Through this Retail Information System, a franchisee reports virtually all store transactions to 7-Eleven, including sales, inventory acquisitions and adjustments, payroll, etc.
>
>C. **Inventory Reporting & Accounting**: A franchisee can finance its purchase of store inventory through the Open Account or purchase inventory with cash. In either instance, the franchisee is obligated to report the inventory transaction and submit the related invoice to 7-Eleven. This inventory is accounted under 7-Eleven's system using a retail accounting system, meaning that inventory in a store is valued at the retail selling price determined by the franchisee. Thus, when a franchisee buys merchandise, the invoice is transmitted to 7-Eleven together with the value of the purchased merchandise at retail. 7-Eleven then increases retail book inventory by the retail value of that merchandise.
>
>D. **Cash Reports**: 7-Eleven franchisees must prepare and transmit to 7-Eleven a daily cash report ("Cash Report"). Among other things, the Cash Report sets forth the daily sales and whether those sales were for cash or credit. The Daily Cash Report also accounts for deductions from cash receipts that affect the daily deposit, such as a franchisee's cash payment to a vendor to acquire merchandise for sale in the store.

E. **Minimum Net Worth**: Most 7-Eleven franchised stores must maintain a "Minimum Net Worth" of $15,000.00 or $10,000.00 depending on the version of franchise agreement signed. A franchisee's "Net Worth" is essentially the sum total of its assets minus its liabilities. The Minimum Net Worth requirement is intended to protect 7-Eleven's investment in the store, its exposure for the Open Account and to assure that a 7-Eleven franchisee is financially vested in the operation of their stores.

F. **Monthly Financials**: 7-Eleven prepares monthly financial reports for each store from its bookkeeping records. This information in its bookkeeping records is supplied primarily by the Franchisee and particularly the Cash Reports. The reports include, among other things, an income statement, balance sheet and calculation of the Open Account balance and Net Worth.

## The Parties' Written Franchise Agreements

19. On or about May 14, 2004, Patel and 7-Eleven entered into a 7-Eleven, Inc. – Individual Store Franchise Agreement (the "Revere Franchise Agreement"), pursuant to which 7-Eleven granted Patel a franchise to operate a 7-Eleven store at 1120 North Shore Road in Revere, Massachusetts (the "Revere Store"). A true and correct copy of the Revere Franchise Agreement is attached to this Complaint as Exhibit A.

20. On or about May 14, 2007, Patel and 7-Eleven entered into a 7-Eleven, Inc. – Individual Store Franchise Agreement (the "Quincy Franchise Agreement"), pursuant to which 7-Eleven granted Patel a franchise to operate a 7-Eleven store at 75 Copeland Street in Quincy, Massachusetts (the "Quincy Store"). A true and correct copy of the Quincy Franchise Agreement is attached to this Complaint as Exhibit B.

21. Under the terms of both Franchise Agreements, 7-Eleven leased the Stores' premises to Patel, together with the fixtures, equipment (such as coolers, soda fountains, grills, a safe, cash registers), and signs needed to operate the Stores. 7-Eleven also provided financing to Patel, including financing for the Stores' inventory. Store inventory and other assets are subject to perfected security interests in 7-Eleven's favor, which secure all the indebtedness of Patel to 7-Eleven.

22. The Franchise Agreements granted Patel a non-exclusive right to use the 7-Eleven Marks in accordance with the terms of the parties' agreements and 7-Eleven's standards and specifications. Patel agreed that 7-Eleven would remain the owner of the Marks and all goodwill associated therewith and also agreed not to interfere with 7-Eleven's rights in the Marks.

23. In exchange for the license and lease, and for various other services (such as advertising, merchandising assistance, bookkeeping, certain maintenance, payment of utility expenses, indemnification for specified losses), 7-Eleven is entitled under the Franchise Agreements to receive a specified percentage of the gross profits of the ongoing operation of each Store.

24. Under the Franchise Agreements, Patel agreed to operate his 7-Eleven Stores in compliance with all laws and in conformance with 7-Eleven's standards and specifications.

25. Patel also agreed to: (i) properly record all sales of Inventory at the time of sale; (ii) truthfully and accurately report all information he provided to 7-Eleven; and (iii) maintain a high ethical standard in the conduct of the franchised businesses and in the operation of the Stores. Those obligations are fundamental to the intended functioning of 7-Eleven's business relationship with its franchisees.

26. Upon termination of the Franchise Agreements, Patel was required to:

> Peaceably surrender the Store and 7-Eleven Equipment . . . transfer to [7-Eleven] the Final Inventory . . . [t]ransfer [to 7-Eleven] the Receipts, Cash Register Fund, prepaid Operating Expenses, money order blanks, bank drafts, lottery tickets and Store supplies . . . .

(*See* Franchise Agreements, ¶ 28(a).)

27. Patel also agreed that, upon termination of the Franchise Agreements, he would cease using the 7-Eleven Marks. (*See* Franchise Agreements, ¶ 28(a)(4).)

## 7-Eleven's Investigation of the Stores

28. In late 2013, the Revere Store and Quincy Store came to the attention of 7-Eleven's Asset Protection Personnel because of prolific and statistically unusual use of point of sale register functions that either cancel or avoid recording a sale.

29. 7-Eleven monitors the use of transaction voiding keys—such as the no sale key, the abort transaction key, the item void key, and the cancel age verification key—because their overuse is often indicative of fraudulent transactions, including especially the underreporting or misreporting of actual retail sales.

30. 7-Eleven's investigation into the Revere Store and the Quincy Store uncovered a pervasive and fraudulent scheme in which Patel incorrectly rang transactions and repeatedly abused the transaction aborting and item voiding functions on the register.

31. 7-Eleven's review covered sample periods of time selected between January 2014 through October 2016. From these sample periods, 7-Eleven examined 560 suspect transactions involving non-scanned sales, cancel age verifications and price look up functions for the Quincy Store and found 279 instances where Patel fraudulently concealed or underreported sales to 7-Eleven. Over that same period for the Revere Store, 7-Eleven examined 584 suspect transactions involving cancel age verifications and price look up functions and found 281 instances where Patel fraudulently concealed or underreported sales to 7-Eleven.

32. As part of its investigation, 7-Eleven reviewed 15 hours of security camera footage of the Stores for the time period from December 7, 2013 through March 31, 2014. Of the 546 transactions reviewed, 107 (or twenty percent) were fraudulent.

33. In hundreds of these transactions viewed by 7-Eleven, customers would typically approach the sales area with merchandise, Patel would total the items and receive cash from the

customer, but Patel would then use the "cancel age verification" or "price look up" or similar voiding key on the register. Upon receiving change, the customer then left the store with the merchandise and, as a consequence of Patel's abuse of the voiding function, the sale was not reported to 7-Eleven and 7-Eleven did not receive the requisite 7-Eleven Charge. On other occasions, Patel avoided the point of sale system altogether by not scanning the items and simply accepting cash for a customer's merchandise.

34. Patel facilitated his fraudulent scheme by maintaining additional, unauthorized cash drawers at the Stores. Patel used these other cash drawers in retail transactions and was observed taking cash from customers for purchases and putting that cash into the unauthorized cash drawers, depriving 7-Eleven of the requisite 7-Eleven Charge.

35. Further, 7-Eleven's review of both Stores revealed numerous instances where the Lottery Commissions reported on the daily Cash Report did not match the Lottery Commissions rung into the point of sale system. Patel fraudulently failed to input hundreds of thousands of dollars in Lottery Commissions into the point of sale system, depriving 7-Eleven of the requisite 7-Eleven Charge for Lottery Commission income.

36. The fraud described above caused Patel's Stores to underreport over $317,865.80 in sales to 7-Eleven, which deprived 7-Eleven of the 7-Eleven Charge on those underreported sales. 7-Eleven's financial losses as a result of Patel's fraud exceed $155,824.12.

## **Termination of the Franchise Agreements**

37. On March 1, 2017, 7-Eleven delivered to Patel a Non-Curable Notice of Material Breach and Termination ("Notice of Termination"). A true and correct copy of the Notice of Termination, prior to signature, is attached to the Complaint as Exhibit C.

38. Because the practices uncovered by 7-Eleven's investigation were willful and fraudulent, violate the fundamental purpose of the Franchise Agreements, and go to the core of the franchise relationship between 7-Eleven and Patel, 7-Eleven terminated the Franchise Agreements immediately and without opportunity to cure.

39. In the Notice of Termination, 7-Eleven declared both Stores' subleases and the equipment leases terminated and demanded that Patel comply with his post-termination obligations under the Franchise Agreements, including that Patel quit the premises, deliver possession to 7-Eleven, and transfer the Stores' inventory to 7-Eleven.

**Patel's Refusal To Surrender Possession of the Stores
and Interference With 7-Eleven's Real Property Rights**

40. Notwithstanding the termination of the Franchise Agreements, Patel has failed and refused to surrender possession of the Stores, equipment, and inventory to 7-Eleven. Patel is holding over in breach of the Franchise Agreements and without legal authority.

41. 7-Eleven, as the lawful owner of the leasehold interests in the real property and owner of the fixtures and equipment in Patel's formerly franchised Stores, has the legal right to make productive use of its properties. Patel's refusal to surrender possession of the properties is interfering with and abrogating 7-Eleven's real property rights, and this interference is causing 7-Eleven irreparable harm.

42. Under the Franchise Agreements, Patel leased the premises and equipment for the Stores from 7-Eleven and, under those Franchise Agreements, 7-Eleven is authorized to take possession of its real property and equipment in the event of termination.

43. Patel repeatedly materially breached the Franchise Agreements, and 7-Eleven's termination of the Franchise Agreements (including the leases contained in those Agreements) ended any right Patel had to possess and use 7-Eleven's real property.

44. Whenever a tenant shall detain the possession of real property after the right has expired, an action for eviction will lie.

### Patel's Infringement Of The 7-Eleven Marks

45. Notwithstanding the termination of the Franchise Agreements, Patel continues to use the 7-Eleven Marks and the 7-Eleven System in connection with the operation of his formerly franchised Stores, continues to market and promote the Stores through the use of the 7-Eleven Marks, continues to hold the Stores out to the public as authorized 7-Eleven Stores, and continues to pass-off the Stores and the products offered by them as being authorized by 7-Eleven when they are not.

46. Patel's use of the 7-Eleven Marks is without the license or consent of 7-Eleven and has caused and is likely to cause mistake, confusion or deception in the minds of the public as to source, affiliation and sponsorship of the Stores.

47. In addition to the fact that both 7-Eleven and Patel offer the identical products at their Stores, the products provided by Patel using the 7-Eleven Marks are offered to the same class of consumers as those who patronize authorized 7-Eleven stores. Upon seeing the familiar 7-Eleven Marks through Patel's unauthorized use thereof, consumers will be deceived into concluding that Patel's Stores, and the products and services offered and sold therein, are subject to 7-Eleven's supervision, are sponsored or endorsed by 7-Eleven and bear the 7-Eleven Marks pursuant to 7-Eleven's authority and permission.

48. So long as Patel continues to use the 7-Eleven Marks in connection with the operation of his Stores, consumers have no practical way of knowing that Patel's former 7-Eleven Stores are no longer affiliated with, or sponsored, authorized or endorsed by, 7-Eleven. As a result, any consumer dissatisfaction with Patel's Stores, or with the products and services

offered in connection therewith, will be attributed to 7-Eleven and the entire 7-Eleven franchise network.

49. Patel has received actual notice of his violation and infringement of the 7-Eleven Marks and has constructive notice of 7-Eleven's rights in the Marks and the registrations thereof pursuant to 15 U.S.C. § 1072. Patel's continued infringement is willful, malicious, fraudulent and deliberate, and is irreparably harming 7-Eleven.

50. 7-Eleven has at all times complied with and fully performed all of its obligations under its agreements with Patel.

## COUNT I

## EVICTION

51. 7-Eleven repeats and realleges ¶¶ 1 through 50 of its Complaint as and for this paragraph 51, as if fully set forth herein.

52. The Franchise Agreements were terminated effective March 1, 2017.

53. Upon termination of the Franchise Agreements, Patel was obligated to surrender the premises for the Stores and related facilities, equipment, and inventory to 7-Eleven.

54. By failing to relinquish possession of the Stores, Patel has committed unlawful detainer, and 7-Eleven is entitled to an order directing Patel to surrender possession of the Stores to 7-Eleven.

55. As a result of Patel's actions, 7-Eleven has suffered and will continue to suffer irreparable injury, including, but not limited to, the inability to exploit, use, and enjoy its real property.

56. 7-Eleven will be irreparably injured if Patel is permitted to retain possession of the Stores and 7-Eleven has no adequate remedy at law for that injury.

## COUNT II

## RECOVERY OF CHATTELS SUBJECT TO SECURITY INTEREST

57. 7-Eleven repeats and realleges ¶¶ 1 through 56 of its Complaint as and for this paragraph 57, as if fully set forth herein.

58. 7-Eleven holds perfected security interests in the inventory and proceeds of the Stores.

59. The security agreements for the Stores provide that, upon termination of the Franchise Agreements, Patel is to return the Stores' inventory to 7-Eleven.

60. Patel has unjustly retained all inventory and proceeds of the Stores.

61. As a direct result of Patel's actions as set forth above, 7-Eleven's security interests have been harmed.

62. 7-Eleven will be irreparably injured if Patel is permitted to retain possession of the inventory, proceeds and other property subject to its security interests, and it has no adequate remedy at law for such injury.

63. 7-Eleven prays that this Court issue an order giving 7-Eleven the right to take possession of the secured property and dispose of it as necessary to preserve its value, including the inventory, merchandise, all vending supplies (including but not limited to cups, containers and bags), receipts, the cash register fund, pre-paid operating expenses, money order blanks, bank drafts, and store supplies.

## COUNT III

## BREACH OF CONTRACT – POST-TERMINATION OBLIGATIONS

64. 7-Eleven repeats and realleges ¶¶ 1 through 63 of its Complaint as and for this paragraph 64, as if fully set forth herein.

65. 7-Eleven terminated the Franchise Agreements because Patel repeatedly materially breached those Agreements by fraudulently underreporting his Stores' sales to 7-Eleven and depriving 7-Eleven of the full 7-Eleven Charge it was entitled to under the Franchise Agreements.

66. Upon termination of the Franchise Agreements, Patel was obligated, among other things, to:

- surrender the Stores' premises to 7-Eleven;
- surrender all 7-Eleven equipment;
- immediately cease using the 7-Eleven Marks and all elements of the 7-Eleven System;
- transfer to 7-Eleven the Receipts, Cash Register Fund, prepaid Operating Expenses, money order blanks, bank drafts, lottery tickets and store supplies to 7-Eleven; and
- return all Trade Secrets and Confidential Information to 7-Eleven.

67. Patel has failed and refused to comply with his post-termination obligations, materially breaching the Franchise Agreements.

68. As a direct and proximate result Patel's breaches of his post-termination obligations, 7-Eleven has been irreparably injured, including injury to its goodwill and reputation, as well as being deprived of its ability to utilize its property, resulting in lost revenues and profits and diminished goodwill, in an amount to be determined at trial.

## COUNT IV

## BREACH OF CONTRACT – DAMAGES

69. 7-Eleven repeats and realleges ¶¶ 1 through 68 of its Complaint as and for this paragraph 69, as if fully set forth herein.

70. In the Franchise Agreements, Patel agreed to:

   a. Cause all sales of inventory to be properly recorded at the time of sale;

   b. Prepare and furnish to 7-Eleven daily reports of Purchases;

   c. Provide 7-Eleven with truthful, accurate and complete information in compliance with all applicable laws and such policies that 7-Eleven implemented from time to time;

   d. Pay all sales, payroll and income taxes with regard to the operation of the store;

   e. Only take draws when financially appropriate in accordance with the procedures contained in the Franchise Agreements;

   f. Maintain a high ethical standard in the conduct of the franchised business and in the operation of the Stores;

   g. Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreements);

   h. Devote his best efforts to the business of the Stores and maximization of the Stores' sales and gross profit, and cause the stores to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image; and

   i. Pay his open account balance upon the discontinuance of 7-Eleven's financing.

71. Patel breached his above obligations, causing 7-Eleven to suffer damages in an amount to be determined at trial.

## COUNT V

## LANHAM ACT - TRADEMARK INFRINGEMENT

72. 7-Eleven repeats and realleges ¶¶ 1 through 71 of its Complaint as and for this paragraph 72, as if fully set forth herein.

73. Patel's acts, practices and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the 7-Eleven Marks, and Patel's sale, offering for sale, distribution or advertising of goods and services under the 7-Eleven Marks, or any designs similar thereto, is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(l).

74. As a direct and proximate result of Patel's infringement, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

75. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Patel's misconduct.

76. Unless enjoined by the Court, Patel will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Patel's continued use of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT VI

## LANHAM ACT – TRADEMARK DILUTION

77. 7-Eleven repeats and realleges ¶¶ 1 through 76 of its Complaint as and for this paragraph 77, as if fully set forth herein.

78. Patel's acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the 7-Eleven Marks, and Patel's sale, offering for sale, distribution or advertising of non-conforming goods under the 7-

Eleven Marks causes dilution of the distinctive quality of the 7-Eleven marks, in violation of 15 U.S.C. § 1125(c).

79. As a direct and proximate result of Patel's infringement, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

80. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation, and goodwill, such that damages alone cannot fully compensate 7-Eleven for Patel's misconduct.

81. Unless enjoined by the Court, Patel will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Patel's continued dilution of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT VII

## LANHAM ACT - UNFAIR COMPETITION

82. 7-Eleven repeats and realleges ¶¶ 1 through 81 of its Complaint as and for this paragraph 82, as if fully set forth herein.

83. Patel's acts, practices and conduct constitute unfair competition, false designation of origin and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C. § 1125(a).

84. As a direct and proximate result of Patel's unfair competition, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

85. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Patel's misconduct.

86. Unless enjoined by the Court, Patel will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Patel's continued use of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

**PRAYER FOR RELIEF**

**WHEREFORE**, 7-Eleven respectfully prays for the following relief against Patel:

(A) A preliminary and permanent injunction directing that Patel surrender possession and be ejected from the premises and facilities at:

    1. 1120 North Shore Road in Revere, Massachusetts; and

    2. 75 Copeland Street in Quincy, Massachusetts.

(B) A preliminary and permanent injunction directing Patel to surrender possession of the inventory and proceeds of the Stores at 1120 North Shore Road in Revere, Massachusetts and 75 Copeland Street in Quincy, Massachusetts, which are subject to 7-Eleven's security interests;

(C) A preliminary and permanent injunction enjoining Patel, his agents, servants and employees and those people in active concert or participation with him, from:

    1. Using the 7-Eleven Marks or any trademark, service mark, logo or trade name that is confusingly similar to the 7-Eleven Marks;

  2.  Otherwise infringing the 7-Eleven Marks or using any similar designation, alone or in combination with any other components;

  3.  Passing off any of his products or services as those of 7-Eleven or 7-Eleven's authorized franchisees;

  4.  Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of his businesses, products or services;

  5.  Causing a likelihood of confusion or misunderstanding as to his affiliation, connection or association with 7-Eleven and its franchisees or any of 7-Eleven's products or services; and

  6.  Unfairly competing with 7-Eleven or its franchisees, in any manner;

(D) An order pursuant to 15 U.S.C. § 1118 that all labels, signs, prints, packages, receptacles, logo items, and advertisements, bearing the 7-Eleven Marks, in the possession of Patel, his agents, servants and employees, and those people in active concert or participation with him, be delivered to 7-Eleven at Patel's cost;

(E) That Patel be ordered to account for and pay over to 7-Eleven all gains, profits and advantages derived by him as a result of his infringement of the 7-Eleven Marks and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117, and by the controlling principles of common law;

(G) That judgment be entered in favor of 7-Eleven and against Patel for such damages as 7-Eleven has sustained by reason of Patel's trademark infringement and unfair competition; and that, because of the willful nature of said infringement, the Court enter judgment for 7-Eleven for three times the amount of said damages, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

(H) That an order be entered directing Patel to surrender to 7-Eleven all signs, marketing materials or other materials containing any of the 7-Eleven Marks;

(I) That Patel be required to file with the Court and to serve upon 7-Eleven's counsel within ten (10) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which he has complied with such injunction or order;

(J) That judgment be entered in favor of 7-Eleven and against Patel for such damages as 7-Eleven has sustained by reason of Patel's breaches of the Franchise Agreement;

(K) That judgment be entered in favor of 7-Eleven and against Patel for the costs and expenses, including reasonable attorneys' fees, incurred by 7-Eleven in connection with this action as provided for by statute; and

(L) Such other relief this Court deems just and proper.

**7-ELEVEN, INC.**

By its attorneys,

/s/ Matthew Iverson
Matthew Iverson (BBO No. 653880)
matthew.iverson@dlapiper.com
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
(617) 406-6000

*Of Counsel*

Norman M. Leon
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
(312) 368-4000

Dated: March 1, 2017